1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay (#270796)
Charles H. Linehan (#307439)
Pavithra Rajesh (#323055)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: clinehan@glancylaw.com

*Counsel for Plaintiffs Jim Buscaglia*
*and Syndi Buscaglia*

[Additional Counsel On Signature Page]

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JIM BUSCAGLIA, and SYNDI BUSCAGLIA, Individually and On Behalf of All Others Similarly Situated, | Case No. |
| | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| SNAP INC., EVAN SPIEGEL, DEREK ANDERSEN, JEREMI GORMAN, and REBECCA MORROW, | |
| Defendants. | |

Plaintiffs Jim Buscaglia and Syndi Buscaglia ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Snap Inc. ("Snap" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Snap; and (c) review of other publicly available information concerning Snap.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a class action on behalf of persons and entities that purchased or otherwise acquired Snap securities, and/or sold Snap put options, between July 22, 2020 and October 21, 2021, inclusive (the "Class Period"). Plaintiffs pursue claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Snap purports to be a camera company, which offers the social media application Snapchat, an eyewear product that connects with Snapchat and captures video Spectacles, and advertising products including AR (augmented reality) and Snap ads. The Company was formerly known as Snapchat, Inc. and changed its name to Snap Inc. in September 2016. Snap relies on user data for its advertising business.

3.     In June 2020, as part of an ongoing privacy push, Apple Inc. ("Apple")—which developed and maintains the popular mobile operating system, iOS, for its mobile devices (the iPhone)—publicly announced new data privacy features for iOS. In April 2021, Apple released the new data privacy features for iOS.

4.     Following Apple's June 2020 announcement, Snap continuously downplayed and misled investors regarding the impact of Apple's new data privacy features would have on its business.

5.      On October 22, 2021, its report for the third quarter of 2021. Therein, Snap announced weaker-than-expected revenue and guidance attributable to its advertising business, which were impacted by Apple's privacy changes. Snap further disclosed the risks of heighted restrictions on the Company's access and use of user data due to Apple's privacy update had materialized, stating that "in April 2021 Apple issued an iOS update that imposes heightened restrictions on our access and use of user data" and "[t]hese changes have adversely affected our targeting, measurement, and optimization capabilities, and in turn affected our ability to measure the effectiveness of advertisements on our services. This has resulted in, and in the future is likely to continue to result in, reduced demand and pricing for our advertising products and could seriously harm our business."

6.      On this news, Snap's stock price fell $19.97 per share, or 26%, to close at $55.14 per share on October 22, 2021, damaging investors.

7.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) Apple's privacy changes would have, and were having, a material impact on the Company's advertising business; (2) Snap overstated its ability to transition its advertising with Apple's privacy changes; (3) Snap knew of, but downplayed, the risks of the impact that Apple's privacy changes had on the Company's advertising business; (4) Snap overstated its commitment to privacy; and (5) as a result of the foregoing, Defendants' public statements and statements to journalists were materially false and/or misleading at all relevant times.

8.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's shares, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

11.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

12.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

13.     Plaintiff Jim Buscaglia, as set forth in the accompanying certification, incorporated by reference herein, purchased Snap securities and sold Snap put options during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14.     Plaintiff Syndi Buscaglia, as set forth in the accompanying certification, incorporated by reference herein, purchased Snap securities and sold Snap put options during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

15. Defendant Snap is a Delaware corporation with its principal executive offices located at 3000 31st Street, Santa Monica, CA 90405. Snap's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "SNAP."

16. Defendant Evan Spiegel ("Spiegel") is a co-founder of Snap and has served as the Company's Chief Executive Officer and as a member of the Company's board of directors since May 2012.

17. Defendant Derek Andersen ("Andersen") has served as Snap's Chief Financial Officer since May 2019.

18. Defendant Jeremi Gorman ("Gorman") has served as Snap's Chief Business Officer since November 2018.

19. Defendant Rebecca Morrow ("Morrow") has served as Snap's Chief Accounting Officer since September 2019.

20. Defendants Spiegel, Andersen, Gorman, and Morrow (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

1
2

## SUBSTANTIVE ALLEGATIONS

### Background

3       21.    Snap purports to be a camera company, which offers the social media
4   application Snapchat, an eyewear product that connects with Snapchat and captures
5   video Spectacles, and advertising products including AR (augmented reality) and
6   Snap ads. The Company was formerly known as Snapchat, Inc. and changed its name
7   to Snap Inc. in September 2016.

8       22.    In June 2020, as part of an ongoing privacy push, Apple—which
9   developed and maintains the popular mobile operating system, iOS, for its mobile
10  devices (the iPhone)—publicly announced new data privacy features for iOS. In April
11  2021, Apple released the new data privacy features for iOS.

12      23.    Snap relies on user data for its advertising business. Following Apple's
13  June 2020 announcement, Snap continuously downplayed and misled investors
14  regarding the impact of Apple's new data privacy features would have on its business.

### Materially False and Misleading

### Statements Issued During the Class Period

17      24.    The Class Period begins on July 22, 2020. On that day, Snap filed with
18  the SEC a quarterly report on Form 10-Q for the period ended June 30, 2020 (the
19  "2Q20 Report") which was signed by Defendants Andersen and Morrow. Attached to
20  the 2Q20 Report were certifications pursuant to the Sarbanes-Oxley Act of 2002
21  ("SOX") signed by Defendants Andersen and Spiegel attesting to the accuracy of
22  financial reporting, the disclosure of any material changes to the Company's internal
23  control over financial reporting and the disclosure of all fraud.

24      25.    The 2Q20 Report stated the following, in pertinent part, regarding Snap's
25  advertising business:

26
27
28
> We generate substantially all of our revenues by offering various
> advertising products on Snapchat, which include Snap Ads and
> Sponsored Creative Tools, and measurement services, referred to as
> advertising revenue.

*     *     *

We sell advertising directly to advertisers ("Snap-sold" revenue) and certain partners that provide content on Snapchat ("media partners") also sell directly to advertisers ("partner-sold" revenue). . . .

*     *     *

**We monetize our business primarily through advertising**. Our advertising products include Snap Ads and Sponsored Creative Tools. We measure our business using ARPU [average revenue per user] because it helps us understand the rate at which we're monetizing our daily user base.

(Emphasis added.)

26.    Contained among other specific and general risks regarding advertising, the 2Q20 Report merely stated the following regarding Apple's publicly known privacy change:

Furthermore, changes to iOS or Android operating systems' practices and policies, such as Apple's upcoming iOS update that **may impose heightened restrictions on our access and use of user data, may reduce the quantity and quality of the data and metrics that can be collected or used by us and our partners**, and adversely affect our ability to effectively target advertisements to users and demonstrate the value of our advertisements to advertisers, any of which could reduce the demand and pricing for our advertising products and seriously harm our business. **The impact of these proposed changes on the overall mobile advertising ecosystem, our business, and the developers, partners, and advertisers within our community is uncertain** depending on how these changes are implemented, how we and the overall mobile advertising ecosystem adjusts, and how our partners, advertisers, and users respond, could seriously harm our business. Any adverse effects could be particularly material to us because we are still early in building our advertising business. Our advertising revenue could be seriously harmed by many other factors, including: … changes in our analytics and measurement solutions, including what we are permitted to collect and disclose under the terms of Apple's and Google's mobile operating system, that demonstrate the value of our advertisements and other

commercial content; … our inability to collect and disclose data or access a user's Identifier for Advertising or similar deterministic identifier that new and existing advertisers may find useful[.]

(Emphasis added.)

27.     On February 4, 2021, during the fourth quarter 2020 earnings call, Defendant Gorman stated the following, in pertinent part, regarding the upcoming Apple update and the Company's purported privacy commitment:

I'll take the IDFA [Apple's Identifier for Advertisers] one first and the 4x growth as you're saying in our down funnel metrics, we're also thrilled to see that. But as it comes to IDFA and the changes, whether or not they will impact us. The reality is we admire Apple, and we believe that they are trying to do the right thing for their customers. ***Their focus on protecting privacy is aligned with our values and the way that we've built our business from the very beginning. So the change here that we're really focused on has less to do with IDFA for which Apple has long offered an opt-out***. And instead on a much more broad policy change that requires Snapchatters to opt into tracking with other personal identifiers such as their e-mail address, which would make it harder for us and the overall digital ad ecosystem to match advertising outcomes. ***But we've been working really closely with Apple to implement SKAdNetwork, which is their privacy protective solution as well as building our own solutions that use aggregated data to protect privacy. We've been communicating very well with advertisers, we're educating them, talking about them deeply about these coming changes and encouraging them to implement our Conversion API and Measurement Kit to mitigate any of this***. And then longer term, we're investing in using first-party data from our platform and providing more opportunities for on platform conversion, which will really help. ***Overall, we feel really well prepared for these changes***. But changes to this ecosystem are usually disruptive and the outcome is uncertain.

(Emphasis added.)

28.     On February 5, 2021, Snap filed with the SEC its yearly report on Form 10-K for the period ended December 31, 2020 (the "2020 Annual Report") which was signed by Defendants Andersen and Morrow. Attached to the 2020 Annual Report

were certifications pursuant to SOX signed by Defendants Andersen and Spiegel attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

29.     The 2020 Annual Report stated the following, in pertinent part, regarding Snap's advertising business:

**Our Advertising Products**

We connect both brand and direct response advertisers to Snapchatters globally. Our ad products are built on the same foundation that makes our consumer products successful. This means that we can take the things we learn while creating our consumer products and apply them to building innovative and engaging advertising products familiar to our community.

*AR Ads*: Advertising through Snap's AR tools unlocks the ability to reach a unique audience in a highly differentiated way. Ads can be served as Sponsored Lenses or Sponsored Filters. Lenses are designed through our camera to take advantage of the reach and scale of our augmented reality platform to create visually engaging 3D experiences. Filters are entertaining, artistic overlays that appear after you take a Snap. These Lenses and Filters can be memorialized on Snapchat, through Brand Profiles that aggregate content, filters, and lenses in a single, easy to find place.

*Snap Ads*: We let advertisers tell their stories the same way our users do, using full screen videos with sound. These also allow advertisers to integrate additional experiences and actions directly within these advertisements, including watching a long-form video, visiting a website, or installing an app. Snap Ads include the following:

- Single Image or Video Ads: These are full screen ads that are skippable, and can contain an attachment to enable Snapchatters to swipe up and take action.

- Story Ads: Story Ads are branded tiles that live within the Discover section of the Stories tab that can be either video ads or a series of 3 to 20 images.

- Collection Ads: Collection Ads feature four tappable tiles to showcase multiple products, giving Snapchatters a frictionless way to browse and buy.

- Dynamic Ads: Dynamic ads leverage our machine learning algorithm to match a product catalog to serve the right ad to the right Snapchatter at the right time.

- Commercials: Commercials are non-skippable for six seconds, but can last up to three minutes. These ads appear within Snapchat's curated content.

*Campaign Management and Delivery*: **We aim to continually improve the way ads are purchased and delivered. We have invested heavily to build our self-serve advertising platform, which provides automated, sophisticated, and scalable ad buying and campaign management.**

We offer the ability to bid for advertisements that are designated to drive Snapchatters to: visit a website, visit a local business, call or text a business, download an app, or return to an app. ***Additionally, our delivery framework continues to optimize relevance of ads across the entire platform by determining the best ad to show to any given user based on their real-time and historical attributes and activity. This decreases the number of wasted impressions while improving the effectiveness of the ads that are shown to our community. This helps advertisers increase their return on investment by providing more refined targeting, the ability to test and learn with different creatives or campaign attributes in real time, and the dynamics of our self-serve pricing.***

*Measuring Advertising Effectiveness*: ***We offer third-party and first-party solutions to provide a vast array of analytics on campaign attributes like reach, frequency, demographics, and viewability; changes in perceptions like brand favorability or purchase intent; and lifts in actual behavior like purchases, foot traffic, app installs, and online purchases.***

\*      \*      \*

***We monetize our business primarily through advertising.*** Our advertising products include Snap Ads and AR Ads. We measure our

business using ARPU because it helps us understand the rate at which we are monetizing our daily user base.

\*      \*      \*

*Revenue*

**We generate substantially all of our revenue through the sale of our advertising products**, which primarily include Snap Ads and AR Ads, and measurement services, referred to as advertising revenue. Snap Ads may be subject to revenue sharing arrangements between us and the media partner. We also generate revenue from sales of our hardware product, Spectacles. This revenue is reported net of allowances for returns.

\*      \*      \*

**We generate substantially all of our revenues by offering various advertising products on Snapchat**, which include Snap Ads and AR Ads, referred to as advertising revenue. AR Ads include Sponsored Filters and Sponsored Lenses. Sponsored Filters allow users to interact with an advertiser's brand by enabling stylized brand artwork to be overlaid on a Snap. Sponsored Lenses allow users to interact with an advertiser's brand by enabling branded augmented reality experiences.

(Emphasis added).

30.     The 2020 Annual Report stated the following, in pertinent part, regarding the Company's purported commitment to privacy, stating in part:

**Our Commitment to Privacy**

***Our approach to privacy is simple: Be upfront, offer choices, and never forget that our community comes first.***

We built Snapchat as an antidote to the context-less communication that has plagued "social media." ***Not so long ago, a conversation among friends would be just that: a private communication in which you knew exactly who you were talking to, what you were talking about, and whether what you were saying was being memorialized for eternity***. . . .

***When you read our Privacy Policy, we hope that you'll notice how much we care about the integrity of personal communication.*** For

starters, we've written our Privacy Policy in plain language because we think it's important that everyone understand exactly how we handle their information. Otherwise, it's hard to make informed choices about how you communicate. We've also created a robust Privacy Center where we show that context and choice are more than talking points. ***There, we point out the many ways that users can control who sees their Snaps and Stories, and explain how long content will remain on our servers, how users can manage the information that we do have about them, and much more***. This is where you'll also find our Transparency Report.

We also understand that privacy policies—no matter how ambitious— are only as good as the people and practices behind those policies. ***When someone trusts us to transmit or store their information, we know we have a responsibility to protect that information and we work hard to keep it secure. New features go through an intense privacy-review process—we debate pros and cons, and we work hard to build products we're proud of and that we'll want to use***. We use Snapchat constantly, both at work and in our personal lives, and we handle user information with the same care that we want for our family, our friends, and ourselves.

(Emphasis added.)

31.     Amongst other specific and general risks regarding advertising, the 2020 Annual Report merely stated the following regarding Apple's publicly known privacy change:

Furthermore, changes to iOS or Android operating systems' practices and policies, ***such as Apple's upcoming iOS update that may impose heightened restrictions on our access and use of user data, may reduce the quantity or quality of the data and metrics that can be collected or used by us and our partners***, or adversely affect our ability to effectively target advertisements to users or demonstrate the value of our advertisements to advertisers, any of which could reduce the demand and pricing for our advertising products and seriously harm our business. The impact of these proposed changes on the overall mobile advertising ecosystem, our business, and the developers, partners, and advertisers within our community is uncertain. Depending on how these changes are implemented, how we and the overall mobile advertising ecosystem adjusts, and how our partners, advertisers, and users respond, our

business could be seriously harmed. Any adverse effects could be particularly material to us because we are still early in building our advertising business. Our advertising revenue could also be seriously harmed by many other factors, including: . . . changes in our analytics and measurement solutions, including what we are permitted to collect and disclose under the terms of Apple's and Google's mobile operating systems, that demonstrate the value of our advertisements and other commercial content . . . our inability to measure the effectiveness of our advertising or target the appropriate audience for advertisements[.]

(Emphasis added.)

32.    On July 22, 2021, during the second quarter 2021 earnings call, Defendant Gorman stated, in pertinent part, the following regarding the Apple's privacy update and the Company's position:

Our ad platform is being utilized as an effective self-service tool to help advertisers of all types and sizes create, manage, and measure campaigns on Snapchat. ***Further, it is a reflection of our focus on privacy and innovation as we are delivering results for advertisers while also respecting the privacy of our community, which has been a core tenet since we launched ads on Snapchat.*** This year has clearly demonstrated how important it is to simultaneously meet these two objectives for our advertising partners. ***As Apple rolled-out its App Tracking Transparency-related changes near the end of Q2, we observed higher opt-in rates than we are seeing reported generally across the industry, which we believe is due in part to the trust our community has in our products and our business.*** Apple's rollout of the most recent iOS update came later in Q2 than initially anticipated, and the pace of updates by iPhone users has also been slower than we anticipated. ***This has given us more time with advertisers to navigate the transition*** but also means the effects of these changes will come later than we initially expected.

We continue to work with our advertising partners on privacy-safe solutions and other attribution techniques. ***For example, we fully rolled out support of SKAdnetwork version 3.0, which we believe will aid in improving attribution for advertisers who have implemented Apple's API.*** We also launched Advanced Conversions in Ads Manager, which allows advertisers to measure their campaigns via our privacy-protecting measurement stack. ***We are dedicated to delivering value for our advertising partners while respecting the privacy of our community, as***

*we have worked to do for many years.* That said, it remains very early in the adoption of the iOS platform changes, and we will continue to learn how these changes may impact our advertising partners, business, and the industry as a whole. We are seeing some initial signals as advertisers test and learn in this new environment and this is causing some interruptions to demand that we had anticipated would be part of the adoption process, particularly in the direct response e-commerce and gaming sectors. It is too early to determine how long it will take until these changes are fully adopted, the scale of the potential interruptions to demand, or the ultimate impact on the longer term growth of our business. . . .

*We continue to invest heavily in video advertising*, with the goal of driving results for our advertising partners and connecting them to the Snapchat Generation. *For example, we worked with Nielsen to help US advertisers understand how to more efficiently reach their target audiences via Snap Ads.* The Total Ad Ratings (TAR) study analyzed how over thirty cross-platform advertising campaigns reached people on both Snapchat and television. The analysis showed that Snapchat campaigns contributed an average of 16 percent incremental reach to advertisers' target audiences, and over 70 percent of the Gen Z audience that was reached by Snapchat was not reached by TV-only campaigns. This is especially important as people are increasingly cutting the cord, and mobile content consumption continues to grow, *presenting us with a large opportunity to help advertisers reach the Snapchat Generation at scale*.

\*     \*     \*

I think the important thing about IDFA is to really understand that the solutions are not yet fully finalized. Everyone is still evolving, Apple, the entire industry is still evolving. *And we've said this before, and I just want to reiterate that we genuinely support Apple's approach. We've always believed that advertising should respect customer's privacy at its core at Snap and the products that this amazing team has built for the last almost 10 years now.* And we've been working really hard to make this transition smooth for our advertising partners as well as our businesses. *So where we are in the cycle right now is that we rolled out full support of SKAdnetwork version 3.0, which we know will aid or we believe will aid in attribution for advertisers.* And we've also implemented Apple's API. *In addition, we launched Advanced*

*Conversions in Ads Manager so advertisers can measure their campaigns with our privacy conscious measurement stack. And then, you know, I think one of the things that we're observing here is that our opt in rates have been above what is sort of widely reported in both the press as well as with the analyst community. So that's, that's good*, but it remains so early in these iOS changes and there's no question that it will be a change for the industry in and of itself. *But you know, I think we prepared it the best that we can. The product teams and the engineering teams have been working really closely with all of our partners and our sales teams to make sure that this transition for our advertisers is as smooth as possible.*

(Emphasis added).

33.     The above statements identified in ¶¶ 24-32 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors that: (1) Apple's privacy changes would have, and were having, a material impact on the Company's advertising business; (2) Snap overstated its ability to transition its advertising with Apple's privacy changes; (3) Snap knew of, but downplayed, the risks of the impact that Apple's privacy changes had on the Company's advertising business; (4) Snap overstated its commitment to privacy; and (5) as a result of the foregoing, Defendants' public statements and statements to journalists were materially false and/or misleading at all relevant times.

## The Truth Emerges

34.     On October 22, 2021, Snap filed its third quarter 2021 report for the period ending September 30, 2021 with the SEC on From 10-Q (the "3Q21 Report"), disclosing the Company's weaker-than-expected revenue and weaker-than-expected guidance because of its advertising business, including due to Apple's privacy changes.

35.     Further, the 3Q21 Report disclosed the risks of heighted restrictions on the Company's access and use of user data due to Apple's privacy update materialized, stating in pertinent part:

Furthermore, ***in April 2021 Apple issued an iOS update that imposes heightened restrictions on our access and use of user data***. Google has announced that it will implement similar changes with respect to its Android operating system and major web browsers, like Safari and Chrome, may make similar changes as well. ***These changes have adversely affected our targeting, measurement, and optimization capabilities, and in turn affected our ability to measure the effectiveness of advertisements on our services. This has resulted in, and in the future is likely to continue to result in, reduced demand and pricing for our advertising products and could seriously harm our business.*** The impact of these changes on the overall mobile advertising ecosystem, our competitors, our business, and the developers, partners, and advertisers within our community is uncertain, and depending on how we, our competitors, and the overall mobile advertising ecosystem adjusts, and how our partners, advertisers, and users respond, our business could be seriously harmed. In addition, if we are unable to mitigate these and future developments, and alternative methods do not become widely adopted by our advertisers, then our targeting, measurement, and optimization capabilities will be materially and adversely affected, which would in turn continue to negatively impact our advertising revenue. Any adverse effects could be particularly material to us because we are still early in building our advertising business. . . .

(Emphasis added.)

36.    On this news, Snap's stock price fell $19.97 per share, or 26%, to close at $55.14 per share on October 22, 2021, damaging investors.

37.    As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## CLASS ACTION ALLEGATIONS

38.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Snap securities, and/or sold Snap put options, between July 22, 2020 and October 21, 2021, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers

and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

39.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Snap's shares actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class.  Millions of Snap shares were traded publicly during the Class Period on the NYSE.  Record owners and other members of the Class may be identified from records maintained by Snap or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

40.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

41.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

42.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Snap; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

43.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

44.     The market for Snap's securities was open, well-developed and efficient at all relevant times.   As a result of these materially false and/or misleading statements, and/or failures to disclose, Snap's shares traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired Snap's securities or sold Snap put options relying upon the integrity of the market price of the Company's shares and market information relating to Snap, and have been damaged thereby.

45.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Snap's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.   The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Snap's business, operations, and prospects as alleged herein.

46.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Snap's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive

assessment of the Company and its financial well-being and prospects, thus causing the Company's shares to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices and selling Snap put options at artificially deflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

47.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

48.     During the Class Period, Plaintiffs and the Class purchased Snap's securities at artificially inflated prices and sold Snap put options at artificially deflated prices and were damaged thereby. The price of the Company's shares significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

49.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Snap, their control over, and/or receipt and/or modification of Snap's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential

proprietary information concerning Snap, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

50.     The market for Snap's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Snap's shares traded at artificially inflated prices during the Class Period.  On September 24, 2021, the Company's share price closed at a Class Period high of $ 83.11 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Snap's securities and market information relating to Snap, and have been damaged thereby.

51.     During the Class Period, the artificial inflation of Snap's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Snap's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Snap and its business, operations, and prospects, thus causing the price of the Company's shares to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's shares at such artificially inflated prices, and selling put options at artificially deflated prices, and each of them has been damaged as a result.

52.     At all relevant times, the market for Snap's securities was an efficient market for the following reasons, among others:

(a)    Snap shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, Snap filed periodic public reports with the SEC and/or the NYSE;

(c)    Snap regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    Snap was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

53.    As a result of the foregoing, the market for Snap's securities promptly digested current information regarding Snap from all publicly available sources and reflected such information in Snap's share price. Under these circumstances, all purchasers of Snap's securities and sellers of Snap put options during the Class Period suffered similar injury through their transactions in Snap's securities a presumption of reliance applies.

54.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.

Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

55.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Snap who knew that the statement was false when made.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and

### Rule 10b-5 Promulgated Thereunder

### Against All Defendants

56.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

57.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Snap's

securities at artificially inflated prices and sell Snap put options at artificially deflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

58. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Snap's shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

59. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Snap's financial well-being and prospects, as specified herein.

60. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Snap's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Snap and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

61. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were

1   high-level executives and/or directors at the Company during the Class Period and
2   members of the Company's management team or had control thereof; (ii) each of
3   these defendants, by virtue of their responsibilities and activities as a senior officer
4   and/or director of the Company, was privy to and participated in the creation,
5   development and reporting of the Company's internal budgets, plans, projections
6   and/or reports; (iii) each of these defendants enjoyed significant personal contact and
7   familiarity with the other defendants and was advised of, and had access to, other
8   members of the Company's management team, internal reports and other data and
9   information about the Company's finances, operations, and sales at all relevant times;
10  and (iv) each of these defendants was aware of the Company's dissemination of
11  information to the investing public which they knew and/or recklessly disregarded
12  was materially false and misleading.

13        62.    Defendants had actual knowledge of the misrepresentations and/or
14  omissions of material facts set forth herein, or acted with reckless disregard for the
15  truth in that they failed to ascertain and to disclose such facts, even though such facts
16  were available to them. Such defendants' material misrepresentations and/or
17  omissions were done knowingly or recklessly and for the purpose and effect of
18  concealing Snap's financial well-being and prospects from the investing public and
19  supporting the artificially inflated price of its shares. As demonstrated by Defendants'
20  overstatements and/or misstatements of the Company's business, operations, financial
21  well-being, and prospects throughout the Class Period, Defendants, if they did not
22  have actual knowledge of the misrepresentations and/or omissions alleged, were
23  reckless in failing to obtain such knowledge by deliberately refraining from taking
24  those steps necessary to discover whether those statements were false or misleading.

25        63.    As a result of the dissemination of the materially false and/or misleading
26  information and/or failure to disclose material facts, as set forth above, the market
27  price of Snap's shares was artificially inflated during the Class Period.  In ignorance
28  of the fact that market prices of the Company's shares were artificially inflated, and

relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the shares trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Snap's securities during the Class Period at artificially high prices and sold Snap put options at artificially deflated prices and were damaged thereby.

64. At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Snap was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Snap securities or sold Snap put options, or, if they had acquired or sold such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid or deflated prices at which they sold.

65. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

66. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## **SECOND CLAIM**

### **Violation of Section 20(a) of The Exchange Act**

### **Against the Individual Defendants**

67. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

68.     Individual Defendants acted as controlling persons of Snap within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

69.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

70.     As set forth above, Snap and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases and sales of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: January 7, 2022                    **GLANCY PRONGAY & MURRAY LLP**

By: *s/ Charles H. Linehan*
Robert V. Prongay
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007

*Counsel for Plaintiffs Jim Buscaglia and Syndi Buscaglia*

**SWORN CERTIFICATION OF PLAINTIFF**

**SNAP, INC. SECURITIES LITIGATION**

I, Jim Buscaglia, certify that:

1. I have reviewed the Complaint, adopt its allegations, and authorize the filing of a Lead Plaintiff motion on my behalf.

2. I did not purchase the Snap, Inc. securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. My transactions in Snap, Inc. securities during the Class Period set forth in the Complaint are as follows:

   (See attached transactions)

5. I have not sought to serve, nor served, as a representative party on behalf of a class under this title during the last three years, except for the following:

6. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

11/23/2021
_____
Date

*Jim Buscaglia*
_____
Jim Buscaglia

**SWORN CERTIFICATION OF PLAINTIFF**


**SNAP, INC. SECURITIES LITIGATION**


I, Syndi Buscaglia, certify that:

1.  I have reviewed the Complaint, adopt its allegations, and authorize the filing of a Lead Plaintiff motion on my behalf.

2.  I did not purchase the Snap, Inc. securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.  I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.  My transactions in Snap, Inc. securities during the Class Period set forth in the Complaint are as follows:

    (See attached transactions)

5.  I have not sought to serve, nor served, as a representative party on behalf of a class under this title during the last three years, except for the following:

6.  I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.


I declare under penalty of perjury that the foregoing are true and correct statements.


11/23/2021                                  *Syndi Buscaglia*
_____          _____
         Date                                      Syndi Buscaglia

**Jim and Syndi Buscaglia's**
**Transactions in Snap Inc. (SNAP)**
**Common Stock**

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 10/29/2021 | Bought | 2,500 | $70.0000 |
| 10/29/2021 | Bought | 5,000 | $70.0000 |

**Options**

| Date | Transaction Type | Contract Type | Exp / Strike | Quantity | Unit Price |
|---|---|---|---|---|---|
| 10/21/2021 | Sold | Put | Oct. 29, 2021 / $70 | -19 | $1.8400 |
| 10/21/2021 | Sold | Put | Oct. 29, 2021 / $70 | -2 | $1.8400 |
| 10/21/2021 | Sold | Put | Oct. 29, 2021 / $70 | -5 | $1.8400 |
| 10/21/2021 | Sold | Put | Oct. 29, 2021 / $70 | -1 | $1.8400 |
| 10/21/2021 | Sold | Put | Oct. 29, 2021 / $70 | -5 | $1.8400 |
| 10/21/2021 | Sold | Put | Oct. 29, 2021 / $70 | -1 | $1.8400 |
| 10/21/2021 | Sold | Put | Oct. 29, 2021 / $70 | -10 | $1.8400 |
| 10/21/2021 | Sold | Put | Oct. 29, 2021 / $70 | -10 | $1.8400 |
| 10/21/2021 | Sold | Put | Oct. 29, 2021 / $70 | -4 | $1.8400 |
| 10/21/2021 | Sold | Put | Oct. 29, 2021 / $70 | -1 | $1.8400 |
| 10/21/2021 | Sold | Put | Oct. 29, 2021 / $70 | -2 | $1.8400 |
| 10/21/2021 | Sold | Put | Oct. 29, 2021 / $70 | -1 | $1.8400 |
| 10/21/2021 | Sold | Put | Oct. 29, 2021 / $70 | -1 | $1.8400 |
| 10/21/2021 | Sold | Put | Oct. 29, 2021 / $70 | -2 | $1.8400 |
| 10/21/2021 | Sold | Put | Oct. 29, 2021 / $70 | -5 | $1.8400 |
| 10/21/2021 | Sold | Put | Oct. 29, 2021 / $70 | -1 | $1.8400 |
| 10/21/2021 | Sold | Put | Oct. 29, 2021 / $70 | -1 | $1.8400 |
| 10/21/2021 | Sold | Put | Oct. 29, 2021 / $70 | -2 | $1.8400 |
| 10/21/2021 | Sold | Put | Oct. 29, 2021 / $70 | -1 | $1.8400 |
| 10/21/2021 | Sold | Put | Oct. 29, 2021 / $70 | -1 | $1.8400 |
| 10/28/2021 | Assigned | Put | Oct. 29, 2021 / $70 | 25 | $0.0000 |
| 10/30/2021 | Assigned | Put | Oct. 29, 2021 / $70 | 50 | $0.0000 |